32 N.J. Super. 23 (1954)
107 A.2d 668
ALBERT D. PETERSON, PLAINTIFF-RESPONDENT,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued August 16, 1954.
Decided September 3, 1954.
*25 Before Judges SPEAKMAN, HEGARTY and CONLON.
Mr. A. Leo Bohl argued the cause for appellant.
Mr. Nathan Rabinowitz argued the cause for respondent.
The opinion of the court was delivered by SPEAKMAN, J.S.C. (temporarily assigned).
On February 23, 1950 defendant issued to the plaintiff its policy of insurance insuring him against loss resulting directly and independently of all other causes from accidental bodily injuries sustained during the term thereof, which contained the following provisions pertinent to this controversy:
 "Section 1 TOTAL DISABILITY
If such injuries shall, within twenty days from the date of accident, wholly and continuously disable and prevent the Insured from performing every duty pertaining to his occupation, the Company will pay weekly indemnity at the rate hereinbefore specified for the period of such continuous total disability, but for not exceeding fifty-two consecutive weeks. After the payment of weekly indemnity for fifty-two weeks as aforesaid, the Company will continue the payment of weekly indemnity at the same rate thereafter so long as the Insured shall be wholly and continuously disabled by such injuries from engaging in any occupation or employment for wage or profit. * * *
 Section 2 PARTIAL DISABILITY
Or, if such injuries shall, within twenty days from the date of accident or immediately following a period of total disability covered under Section 1, continuously disable and prevent the Insured from performing an important daily duty pertaining to his occupation, the Company will pay for the period of such continuous partial disability, at the rate of two-fifths of the weekly indemnity specified for total disability but for not exceeding twenty-six consecutive weeks. * * *"
The weekly indemnity rate specified in the policy for total disability was $25 and for partial disability $10.
On June 26, 1950, while the policy was in full force and effect, plaintiff, a carpenter by trade, who was at the time working on a telephone building in Radburn, New Jersey, slipped and fell from an iron girder to the floor, 20 feet *26 below. At the Barnet Memorial Hospital, where he was immediately taken, it was discovered that he had compound fractures of both wrists, injuries to his hands, arms and right elbow, numerous contusions about the left side of his face, left thigh and the left side of his abdomen and that he was in a state of shock. He was bleeding internally, and on the operating table six tears in the messenteric section of the small intestine were found.
Conceding plaintiff's right to indemnity under the first sentence of section 1 as being wholly and continuously disabled and prevented from performing every duty pertaining to his occupation, defendant paid plaintiff $25 a week for 52 weeks. Under the second sentence of section 1 which required plaintiff to be wholly and continuously disabled from engaging in any occupation or employment for wage or profit, defendant continued to make payments in a like amount until March 3, 1952. On that date total disability payments were terminated and thereafter partial disability payments in the amount of $10 weekly were made for 26 weeks as provided in section 2. During the period of partial disability payments, plaintiff did not object to receiving the lesser sum. After they were terminated, however, the present action was instituted wherein plaintiff sought to recover the sum of $435, the alleged difference between the temporary disability payments received and total disability benefits alleged to be due for the period March 3 to September 22, 1952. In his complaint plaintiff alleged that during that period he continued to be wholly disabled from engaging in any occupation or employment for wage or profit.
At the subsequent trial before the district court judge, sitting without a jury, in addition to the facts above set forth the plaintiff presented evidence that X-rays of the right wrist disclosed that the fragments had not united properly and that there was some deformity of the wrist, that there were hypertrophic productive changes of the right elbow, that he still complains of his abdominal condition, that both hands show osteo-arthritic changes of a traumatic origin and that he has Sudek's atrophy of both wrists.
*27 Additionally Dr. Policastro, a neuro-psychiatrist who examined plaintiff in January 1951 and again on June 22, 1953, testified that as a result of the injuries sustained, plaintiff had developed a traumatic neurosis which was manifest on his first examination and at the time of his second examination was so marked as to be characterized as manic-depressive psychosis rendering him unable to fulfill any work of any kind. Plaintiff's uncontroverted testimony was that he had not been employed since the accident.
For the defendant evidence was introduced that during the time that plaintiff claimed he was totally unable to perform any work, he had signed applications for automobile driver's licenses, although during the same period he had endorsed the checks he received from defendant with an "x," that at one time or another he had been seen driving a car, chopping wood, lighting a pipe, as well as drying dishes and shoveling snow. Defendant also presented the medical testimony of Dr. Flicker, a neuro-psychiatrist who examined the plaintiff on November 29, 1951, who expressed the opinion that at the time of his examination plaintiff was able to do some minor things in industry, "possibly even going in the capacity of a watchman or a door checker," but probably would never be able to return to work as a carpenter.
In passing, it is interesting to note that notwithstanding Dr. Flicker's opinion the defendant continued to make total disability payments under the second sentence of section 1 until March 3 of the following year.
On this conflicting evidence the trial judge found as a fact that from March 3, 1952 to September 22, 1952  the period during which defendant had been paying partial disability  the plaintiff was wholly and continuously disabled from engaging in any occupation or employment for wage or profit and that in the circumstances disclosed the payment to and the acceptance by the plaintiff of checks for partial disability did not constitute an accord and satisfaction. From the subsequent judgment in favor of the plaintiff for the amount demanded in the complaint the defendant took the present appeal.
*28 The defendant presents three grounds for reversal of the challenged judgment: (1) that during the 26-week period commencing March 3, 1952, the plaintiff was not totally disabled within the meaning of the policy; (2) that in any event the payment of partial disability to and acceptance thereof by the plaintiff without objection during this period constituted an accord and satisfaction, and (3) that the trial court's statement in his "conclusions of law" that the plaintiff had sustained the burden of establishing that he was disabled during this period from performing every duty pertaining to his occupation (emphasis supplied) was (a) an improper test under the policy provisions and (b) inconsistent with the trial court's findings of fact.
The resolution of the first contention requires the ascertainment of the meaning of section 1 of the policy and particularly the second sentence thereof, which reads:
"After the payment of weekly indemnity for fity-two weeks as aforesaid, the Company will continue the payment of weekly indemnity at the same rate thereafter so long as the Insured shall be wholly and continuously disabled by such injuries from engaging in any occupation or employment for wage or profit."
Identical or substantially identical language has long been contained in insurance contracts and on a number of prior occasions has been the subject of judicial scrutiny in this State.
Our courts, both trial and appellate, have consistently taken the view that this provision must be liberally and not literally, reasonably and not unreasonably, naturally and not unnaturally construed so as to obtain the objects for which the contract is designed and the purpose to which it is applied. Thus it has been uniformly held that this language should not be construed as requiring a state of absolute inability to carry on any vocation whatsoever, Doherty v. American Employers' Insurance Co., 112 N.J.L. 52 (E. & A. 1934); Nickolopulos v. Equitable Life Assurance Society, 113 N.J.L. 450 (E. & A. 1934); Woodrow v. Travelers Insurance Co., 121 N.J.L. 170 (E. & A. 1938); Rosenthal *29 v. Colonial Life Insurance Co., 118 N.J. Eq. 182 (Ch. 1935); Barbato v. Prudential Insurance Co., 11 N.J. Misc. 355 (Sup. Ct. 1933), but should be construed as meaning an inability to perform any work for compensation of financial value in his regular business or any other pursuit for which he was qualified and which he would be reasonably contemplated to pursue. Nickolopulos v. Equitable Life Assurance Society, supra; Kordulak v. Prudential Insurance Co., 15 N.J. Misc. 242 (Dist. Ct. 1937), and cases cited therein.
Vice-Chancellor Sooy in Rosenthal v. Colonial Life Insurance Co., supra, in rejecting the contention that such a provision should be literally construed, quoted with approval the following language from Foglesong v. Modern Brotherhood, 121 Mo. App. 548, 97 S.W. 240 (Kan. Cty. Ct. App. Mo. 1906):
"`Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation  some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade, or follow the business of selling shoestrings or lead pencils, or follow some similar calling; in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties.'"
The weight of modern authority in other jurisdictions is in accord with the foregoing views. Although judicial craftsmanship tends to the expression of the same idea in many ways, it is of interest to note from a kaleidoscopic review of them that the authorities elsewhere disclose a striking similarity in language to that employed by our courts. Without attempting to catalogue these numerous decisions, 146 A.L.R. 9 et seq., it is sufficient to record that the views therein expressed are perhaps best epitomized by the language of the Kentucky Court of Appeals in Mutual Life Insurance Co. of New York v. Bryant, 296 Ky. 815, 177 S.W.2d 588 *30 (Ky. Ct. App. 1943, rehearing denied 1944), where in construing language similar to that involved here, the court said:
"* * * and that the words `any or all', and other words of like import, when used in such policy contracts, should not be construed to mean a single or particular occupation but should be given the construction and meaning which such language naturally import. In such contracts (nonoccupational) the insured should be required to show physical inability not only to follow his regular occupation but also any occupation for which he may be fitted by education, training and experience, which may yield a reasonably substantial gain or profit, rising to the dignity of an income or livelihood."
Defendant urges strenuously that the construction heretofore placed on this provision by our courts is no longer permissible under Kazala v. Prudential Insurance Co. of America, 12 N.J. 75 (1953), in view of the juxtaposition of the first and second sentences in section 1. We cannot, however, give to that decision the effect claimed for it by the defendant. The facts there were radically different from those here and the policy provision there under consideration was different from the one here involved. Justice Burling, who wrote the unanimous opinion of the Supreme Court, expressly noted the distinction between the language there considered and the policy provision in the Woodrow case, which was identical with the one here. The distinction is substantial and, in our view, sound. Defendant obtains no support from the decision in the Kazala case.
In the light of our construction of the second sentence of section 1 of the policy it is clear that the plaintiff sustained the burden of proving by a fair preponderance of the evidence that he was wholly and continuously disabled from engaging in any occupation or employment for wage or profit. Certainly here, where the physical condition of the plaintiff is the critical inquiry, it cannot be said that substantial justice requires a reversal of the findings of fact of the trial judge who had the advantage of seeing the witnesses, including the plaintiff, and was thus in a better position than we to evaluate their testimony. R.R. 1:5-3(a); cf. Trusky *31 v. Ford Motor Co., 19 N.J. Super. 100 (App. Div. 1952); Julius Reiner Corp. v. Sutton, 23 N.J. Super. 93 (App. Div. 1952).
The contention that the payment of partial disability to and acceptance thereof by the plaintiff without objection constitutes an accord and satisfaction is equally without merit. To constitute an accord and satisfaction under the circumstances existing here it must appear that the defendant offered the partial disability payments and that the plaintiff accepted them with the intention that they operate as a satisfaction of the defendant's entire liability under its policy, Castelli v. Jereissati, 80 N.J.L. 295 (E. & A. 1910); Rose v. American Paper Co., 83 N.J.L. 707 (E. & A. 1912); Decker v. George W. Smith & Co., 88 N.J.L. 630 (E. & A. 1916); Kissell v. Myer & Bush Co., 96 N.J.L. 513 (E. & A. 1921).
In Rose v. American Paper Co., supra, the former Court of Errors and Appeals clearly sets forth the elements necessary to establish an accord and satisfaction (83 N.J.L. 709):
"Now, of course, the rule of law is that where a claim is unliquidated or in dispute payment and acceptance of a less sum than claimed, in satisfaction, operates as an accord and satisfaction. 1 Cyc. 329.
To constitute an accord and satisfaction in law, dependent upon the offer of the payment of a less sum than that claimed, it is necessary that the money should be offered in full satisfaction of the demand and be accompanied by such acts or declarations as amount to a condition that if the money is accepted it is to be in full satisfaction, and be of such a character that the creditor is bound to understand such offer. 1 Cyc. 333.
The party seeking to settle for a less sum than is claimed to be due must, by his words or conduct when making the offer, clearly inform the other of what is sought and expected. The transaction must be such that the condition is as plain as the tender, so that the acceptance of the tender will involve the acceptance of the condition. In other words, the tender and the condition must be incapable of severance; for otherwise the inference will not be drawn that the acceptance of the tender involves the acceptance of the condition. Lang v. Lang, 83 Ill. App. 543, approved, Reid v. McMillan, 189 Ill. 411."
*32 There is absolutely no evidence in the record before us to support the defendant's contention that the partial disability payments of $10 weekly were offered to the plaintiff and accepted by him in full settlement and satisfaction of total disability payments of $25 weekly. These payments were not made in compromise of any dispute between the parties, but were made by virtue of what the defendant deemed to be its obligation under section 2 of its policy.
Defendant's third contention is utterly without substance. In the findings of facts filed April 7, 1954 the district court judge specifically found as a fact that after the 52-week period (during which defendant concedes plaintiff was occupationally disabled) the plaintiff was wholly and continuously disabled from engaging in any occupation or employment for wage or profit for the period March 3, 1952 to September 22, 1952. This finding is couched in the express language of the second sentence of section 1 and there can be no doubt as to what it means. As we have previously mentioned, we entirely concur in the conclusion reached in this regard by the trial judge. The fact that in the "conclusions of law" the trial judge spoke in terms of the first sentence of section 1 rather than the second sentence does not vitiate or render nugatory his previously stated factual finding. Whatever may have been required under the practice in former years, and we do not pause to inquire into that, under our present practice, R.R. 1:5-3, if there is an inconsistency a reversal or a remand is not required. If necessary the mandate of this court may provide for an appropriate amendment of the "conclusions of law" filed in the lower court.
One further matter should be mentioned. Payments for temporary disability were made in accordance with section 2 for a period of 26 weeks commencing March 3, 1952 and terminating as of September 1, 1952. It was alleged in the complaint and found by the district court judge that the plaintiff was totally disabled within the meaning of the second sentence of section 1 from March 3 to September 22, 1952, a period of 29 weeks. Mathematically it would appear that the plaintiff would have been entitled to recover the *33 sum of $465 rather than $435. However, the latter sum is the amount demanded in the complaint and the amount for which judgment was entered, and since no point was made of it either in the complaint or at the trial, the excess will be deemed waived.
The judgment of the district court is affirmed.